# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (715) 701-3844 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON

Case No. 22-M-624

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 21 U.S.C. § 841(a).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of six months is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Brian M. D'Arcy_ 02/10/22 at 12:28 PM
Applicant's signature

SA Brian M. D'Arcy, Federal Bureau of Investigation
Printed Name and Title

Sworn to before me and signed in my presence:

Date: 2-10-2022

Judge's signature

Hon. James R. Sickel, U.S. Magistrate Judge
Printed Name and Title

City and State: Green Bay, Wisconsin

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (715) 701-3844 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON

Case No. 22-m-624

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(715) 701-3844** ("the SUBJECT PHONE"), that is stored at premises controlled by Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, and crimes occurring on Native American reservations. I have

1

experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a) have been committed by Candice Sanapaw. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

5. On June 3, 2021 at approximately 10:10 AM, the Menominee Tribal Police (METPD) and Menominee County Sheriff's Office (MCSO) responded to N3594 1st Avenue in Neopit, Wisconsin following a report of an adult female who was unresponsive and not breathing. Once officers arrived on scene, they performed life saving measures on the female victim until emergency services arrived. At approximately 10:48 AM, life saving measures were stopped and the coroner was requested to the residence. The deceased victim was identified as Samantha Rojas (DOB 12/08/1998).

2

6.  During METPD and MCSO's initial response and subsequent search of the residence at N3594 1st Avenue, law enforcement observed tinfoil on the kitchen table and an open purse with a clear plastic baggie inside containing a large amount of a white, powdery substance. This substance was later identified as baking soda, which investigators know to be a common cutting agent for cocaine. The purse also contained prescription pill bottles that had Samantha Rojas' name on them. An iPhone with a pink/blue case was located next to the purse and was identified as Rojas'. A subsequent search of this phone revealed the telephone number associated with the device to be (715) 280-0149. Additionally, investigators located a Facebook Messenger conversation between Rojas and Candice Sanapaw the night prior to her death, which appeared to be drug-related. Menominee Tribal Police had telephone number **(715) 701-3844** on file for Candice Sanapaw from previous contacts with law enforcement.

7.  Following the incident, investigators conducted multiple interviews of two witnesses who were with Rojas prior to her death: Brennan Waupoose and Taylor James. Both Waupoose and James were friends of Samantha Rojas. Brennan Waupoose called 911 on the morning of June 3, 2021 to report Rojas as unresponsive and not breathing. Waupoose told investigators that, prior to her death, he was with Rojas all day. Around 2:00 or 3:00 PM on June 2, 2021, Rojas and Waupoose went to Pine Ridge near Amber Warrington's house and hung out. Waupoose and Rojas then went riding around and, during this time, Taylor James messaged Rojas. James said that she had been kicked out of her sister's house and asked to be picked up.

8.  Prior to picking up James on June 2, 2021, Waupoose and Rojas picked up cocaine and used it. Rojas went a few houses down from where Amber Warrington lived to pick up the cocaine. Rojas and Waupoose picked up cocaine twice before meeting with James. Waupoose described the house that Rojas went into as light blue and said that Mary Lawe used to live there.

3

Investigators are aware that Candice Sanapaw currently lives at this address. Waupoose never went into the house with Rojas to purchase the cocaine. Prior to picking up James, Waupoose and Rojas used cocaine two times by sniffing and smoking it. The cocaine was packaged in a clear bag.

9. Waupoose told investigators that he and Rojas picked up Taylor James at "Honey's" house on Rabbit Ridge. Waupoose stated that, when he and Rojas arrived at "Honey's" house in Rabbit Ridge, James told Waupoose and Rojas to wait before they left the residence. A male individual pulled up to "Honey's" house in a car and James exited Waupoose' vehicle and met with the male. She then came back to Waupoose' vehicle and they left the residence. They drove around with James for a little bit and James obtained permission for them to stay at her sister, Tai James', house in Neopit. Waupoose did not remember stopping to purchase more cocaine in Pine Ridge when James was with him and Rojas. Rojas, James, and Waupoose traveled to Neopit and went to Tai James' residence. While there, Waupoose and James used heroin and Rojas used cocaine. James had procured the heroin prior to arriving at the residence. Waupoose assumed James had obtained the heroin from the individual outside of "Honey's" house. Waupoose did not see Rojas use heroin, but he did see her smoke cocaine in the kitchen. Waupoose believed this was the same cocaine that Rojas had purchased at the house earlier in the day. Waupoose, Rojas, and James did not stop anywhere else to get cocaine.

10. After smoking the cocaine, Waupoose said that Rojas seemed fine and did not complain about anything. Waupoose fell asleep before Rojas and James. When he woke up, Waupoose saw that Rojas was lying face down and not moving, so he checked on her. Waupoose said that Rojas was dead at that point, so he called 911.

11. Waupoose recalled stopping at the house in Pine Ridge to purchase cocaine with Rojas about one month prior to her death. Rojas went into the house to get the cocaine, but

4

Waupoose did not. Waupoose did not know the name of the person who lived at the house and Rojas had not mentioned it.

12. In addition to Waupoose, investigators conducted multiple interviews of Taylor James following the death of Samantha Rojas. James told investigators that, prior to meeting up with Rojas and Waupoose, she was with her friend Paul Ryan. James and Ryan went to pick up heroin, which they subsequently used, and then James went to her younger sister's house. James' sister kicked her out of the house, so Paul Ryan picked her up again. Ryan and James then went to Ryan's grandmother's house while James waited for Waupoose and Rojas to pick her up. Investigators explained to James that Waupoose had described her as meeting up with an individual in front of "Honey's" house after Waupoose and Rojas picked her up. James did not recall this and believed Waupoose may have been referring to her being with Paul Ryan. James said that she had left her stuff at Ryan's and remembered going back into the house to grab it before she, Rojas, and Waupoose left.

13. After Rojas and Waupoose picked her up, James said that Rojas wanted to buy cocaine, but did not have any money. James provided Rojas with $50 in cash and they went to Candice Sanapaw's house in Pine Ridge. Rojas' mother, Amber Warrington, lives on the same street as Sanapaw. James believed it was later in the evening when they went to Sanapaw's house, possibly around 10:00 or 11:00 PM. Rojas went into Sanapaw's house and was in the house for approximately 10 to 15 minutes. When Rojas came back out to the vehicle, she showed James the cocaine that she purchased. After this, James obtained permission to stay at her sister's house and she, Rojas, and Waupoose travelled to Neopit.

14. When Rojas, Waupoose, and James were at James' sister's house, James and Waupoose used a little bit of the cocaine. James had used the heroin she obtained earlier in the

5

evening with Waupoose on the card ride up to her sister's house. Rojas used the cocaine all night. James saw Rojas use the cocaine because she was laying on a bed in the living room with James. James believed that Rojas was also using the cocaine in the bathroom and car as well. James knew Rojas to smoke cocaine on foil, spreading it out with water and baking soda. At one point during the evening, James woke up and thought she saw Rojas smoking what appeared to be heroin or some type of downer. James was not sure where Rojas would have obtained it from, because she did not believe Waupoose had any.

15. James did not recall picking up any more drugs between Candice Sanapaw's house and her sister's house in Neopit. James left the residence around 5:00 or 6:00 AM on June 3, 2021 to walk to a friend's house in Sewer Circle. James was not at the house when Waupoose woke up and found Rojas dead.

16. James recalled purchasing drugs with Rojas from Candice Sanapaw's home on three occasions in the past. Rojas only purchased cocaine because she only used cocaine. James offered Rojas harder drugs in the past, but Rojas always declined the offer. During the past instances in which Rojas purchased cocaine from Sanapaw, James did not go into the house with Rojas. However, Rojas would get into the car and show Rojas the cocaine because she was excited to get it. James said that Rojas used Sanapaw as her back-up dealer when her source in Green Bay would not answer her. James was not aware of Rojas having any cocaine prior to obtaining it from Sanapaw during the evening of her death.

17. Approximately one week after Rojas' death, METPD Detective and FBI Task Force Officer Joshua Lawe contacted Amber Warrington, the mother of Samantha Rojas. Warrington provided Detective Lawe with the pass code to Rojas' cell phone, which was seized during the search of N3594 1st Avenue on June 3, 2021. During a cursory search of the phone, Detective

6

Lawe observed a Facebook Messenger conversation between Samantha Rojas and Candice Sanapaw at 12:19 AM on June 3, 2021. The Facebook username used to communicate with Rojas was listed as "Candice Sanapaw" and appeared to show a Facebook profile photo of Sanapaw. The text message conversation read as follows:

    a. **Rojas:** My girl needs a 50

    b. **Sanapaw:** *(Emoji thumbs up)*

    c. **Sanapaw:** You can come

    d. **Sanapaw:** For her

    e. **Rojas:** Yeah im omw *(on my way)*

    f. **Sanapaw:** *(Emoji thumbs up)*

18. Based on his training and experience, Detective Lawe is aware that the term "50" is slang for a half gram of a controlled substance. Investigators believe that Rojas asked Sanapaw for a half gram of cocaine when she said, "My girl needs a 50." Sanapaw then replied that Rojas could come pick it up for her friend.

19. Following the initial review of Rojas' cellular telephone by METPD, it was collected from METPD evidence and placed into FBI evidence. FBI forensic examiners imaged the phone and created a Report of Examination. The report listed the telephone number belonging to the phone as (715) 280-0149. METPD had telephone number **(715) 701-3844** listed for Candice Sanapaw from previous contacts with law enforcement. Additionally, open-source research revealed telephone number **(715) 701-3844** to be associated with Candice Sanapaw. Detective Lawe is also familiar with Sanapaw and aware that she utilizes telephone number **(715) 701-3844**.

20. During additional review of the phone, investigators observed what appeared to be drug-related messages sent between Rojas and Sanapaw further back in their conversation history. These messages dated back to April 20, 2021 and included, in part, the messages listed below.

21. On April 20, 2021 at 11:16 PM, the following conversation was observed:

   a. **Rojas:** Yk where the wite gurl at

   b. **Sanapaw:** My house

   c. **Rojas :** I need a 50

   d. **Sanapaw:** *(Emoji thumbs up)*

   e. **Sanapaw:** Coming?

   f. **Rojas:** Yeah im here

   g. **Sanapaw:** *(Emoji thumbs up)*

22. Based on their training and experience, investigators are aware that "white girl" is slang for cocaine. Investigators believe that Rojas asked Sanapaw where she could get cocaine. Sanapaw replied that Rojas could get it at her house, and Rojas said that she needed a "50."

23. On April 21, 2021 at 1:31 AM, the following conversation was observed:

   a. **Rojas:** Lemme get another 50 *(Emoji smiley face)*

   b. **Sanapaw:** *(Unknown Image)*

   c. **Sanapaw:** Come through

   d. **Rojas:** Ok coming from shawano

   e. **Sanapaw:** *(Unknown Image)*

   f. **Rojas:** Nvm *(nevermind)* we just got into ktown lol

   g. **Sanapaw:** *(Unknown Image)*

   h. **Rojas:** Here

8

i. **Sanapaw:** Come in

24. Based on their training and experience, investigators believe that Rojas asked Sanapaw for an additional quantity of cocaine, possibly a half-gram ("50"). Rojas then appears to meet Sanapaw at a location in Keshena (ktown), possibly Sanapaw's residence.

25. On April 24, 2021 at 11:24 PM, the following conversation was observed:

    a. **Rojas:** Hey I have $100

    b. **Sanapaw:** *(Unknown Image)*

    c. **Sanapaw:** ETA

    d. **Rojas:** 30 mins

    e. **Sanapaw:** *(Unknown Image)*

    f. **Rojas:** Nvm *(nevermind)* I'm close

    g. **Rojas:** Here

    h. **Sanapaw:** lol

26. On April 25, 2021 at 2:57 AM, the following conversation was observed:

    a. **Rojas:** You still up?

    b. **Sanapaw:** *(Unknown Image)*

    c. **Sanapaw:** How many

    d. **Rojas:** Another 100

    e. **Sanapaw:** *(Unknown Image)*

    f. **Rojas:** Here

27. Based on their training and experience, investigators believe that Rojas asked Sanapaw for $100-worth of a controlled substance, likely cocaine. Rojas then asked Sanapaw for another $100-worth of a controlled substance during the early morning hours of April 25, 2021.

28. On April 30, 2021 at 2:03 PM, the following conversation was observed:

   a. **Rojas:** I got 200)

   b. **Rojas:** I'm omw *(on my way)* from Neopit

   c. **Sanapaw:** Okay

   d. **Sanapaw:** I hook ya up

   e. **Sanapaw:** 1 package

   f. **Rojas:** Okay bet

   g. **Sanapaw:** Or separate

   h. **Rojas:** 1 pack

   i. **Sanapaw:** Okay

   j. **Rojas:** Ty

   k. **Sanapaw:** Np

   l. **Rojas:** I need another 200 (April 30, 2021 at 7:16 PM)

   m. **Sanapaw:** I'm home (April 30, 2021 at 8:17 PM)

   n. **Rojas:** Here

   o. **Sanapaw:** Me too *(Laughing Emojis)*

   p. **Sanapaw:** Just pulled in

   q. **Rojas:** Lmfao fuck I'm across the street

   r. **Sanapaw:** come over

29. Based on their training and experience, investigators believe that Rojas requested $200-worth of a controlled substance, likely cocaine, from Sanapaw. Sanapaw agreed to sell the controlled substance to Rojas, possibly meeting with her on two separate occasions on April 30, 2021.

30. On May 6, 2021 at 5:30 PM, the following conversation was observed:

    a. **Rojas:** I'll prolly get some today

    b. **Rojas:** Or rn *(right now)* I'm in shawano

    c. **Rojas:** 200

    d. **Rojas:** Worth

    e. **Sanapaw:** *(Unknown Image)*

31. Based on their training and experience, investigators believe that Rojas told Sanapaw that she was going to purchase $200-worth of a controlled substance, likely cocaine, from Sanapaw.

32. On May 13, 2021 at 12:57 AM, the following conversation was observed:

    a. **Rojas:** Be by in 30 mins can I get a 100

    b. **Sanapaw:** *(Unknown Image)*

33. On May 16, 2021 at 3:16 PM, the following conversation was observed:

    a. **Rojas:** We got 2 left and I got 20 dollars can you hook it up with a 50 for now pay ya the rest tomorrow?

    b. **Sanapaw:** Take the tacos

    c. **Sanapaw:** And that's fine with the other thing

    d. **Rojas:** Okay I'll lyk *(let you know)* when I'm omw *(on my way)*

    e. **Sanapaw:** *(Unknown Image)*

    f. **Rojas:** Wait do you still want the $20

34. Based on their training and experience, investigators believe that Rojas advised Sanapaw that she was going to stop by on May 13, 2021 to purchase $100-worth of a controlled substance. On May 16, 2021, Rojas told Sanapaw that she only had $20, but was looking to

11

purchase $50-worth of a controlled substance, and would pay Sanapaw the remainder of the cost the next day.

35. On May 19, 2021 at 12:58 AM, the following conversation was observed:

   a. **Rojas:** Another 100

   b. **Sanapaw:** *(Unknown Image)*

36. On May 24, 2021 at 5:54 PM, the following conversation was observed:

   a. **Rojas:** Hey my girl is looking for a 50

   b. **Rojas:** It's not my money doe

   c. **Rojas:** Nvm *(nevermind)*

   d. **Rojas:** Lol

   e. **Sanapaw:** That's fine

   f. **Rojas:** Owm *(possibly "on my way")*

   g. **Sanapaw:** Just don't forgetting about me

   h. **Sanapaw:** How long

   i. **Rojas:** 10 mins away

   j. **Rojas:** Not far

   k. **Sanapaw:** Okay

   l. **Rojas:** 20 (May 24, 2021 at 9:16 PM)

   m. **Rojas:** ?

37. Based on their training and experience, investigators believe Rojas requested $100-worth of a controlled substance, likely cocaine, from Sanapaw on May 19, 2021. On May 24, 2021, Rojas appeared to ask Sanapaw for a quantity of a controlled substance for "her girl," and appeared

to possibly meet with Sanapaw. Rojas may have asked for an additional $20-worth of a controlled substance later in the evening.

38. On June 2, 2021 at 9:54 PM, the following conversation was observed:

   a. **Sanapaw:** Come over

   b. **Rojas:** Ok

   c. **Rojas:** Can you do bins? (June 2, 2021 at 11:20 PM)

   d. **Sanapaw:** No

   e. **Rojas:** Okay

39. Based on their training and experience, investigators believe the term "bins" may refer to a small gram-package of cocaine.

40. On August 10, 2021, investigators interviewed Candice Sanapaw. Sanapaw told investigators that she saw Rojas the night before she died. Rojas stopped into Sanapaw's house at some point after dinner, possibly around 9:00 PM. Rojas came by herself and stayed for approximately 10 to 15 minutes. Sanapaw was aware that Rojas was a diabetic and had been in the hospital every couple of months because of her blood sugar being low. Sanapaw talked with Rojas about being careful with her health and needing to take extra precautions because of her condition. Sanapaw knew that Rojas drank and smoked weed, but did not know Rojas to use other drugs. Sanapaw denied delivering cocaine to Rojas the night before she died.

41. In August 2021, investigators received the autopsy and toxicology report from the Milwaukee County Medical Examiner's Office regarding Rojas' death. According to the report, the cause of death was listed as Acute Mixed Drug (Cocaine and Fentanyl) Intoxication.

42. Based on the above-mentioned information, investigators believe that Candice Sanapaw sold cocaine to Samantha Rojas the evening prior to her death. This cocaine then caused

13

the death of Rojas, according to the Medical Examiner's report. Given this information, investigators are seeking historical location data for telephone number **(715) 701-3844** belonging to Candice Sanapaw. This information may assist in determining the location of Sanapaw throughout the evening of June 2, 2021, and the morning of June 3, 2021, and during previous incidents of possible narcotics sales between Sanapaw and Rojas. This, in turn, may assist investigators in corroborating statements made by witnesses or aide in discovering additional witnesses or suspects.

43. I am seeking records from Verizon for the following dates in 2021: April 20, April 21, April 24, April 25, April 30, May 6, May 13, May 16, May 19, May 24, June 2, and June 3. I am requesting these records in an attempt to determine Sanapaw's locations during previous suspected narcotics transactions with Rojas. These dates are based on the Facebook Messenger conversations between Rojas and Sanapaw listed above, which appear to be drug related. This information may assist investigators in corroborating witness statements and in establishing a pattern of behavior prior to Rojas' death.

44. In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless

14

Case 1:22-mj-00624-JRS   Filed 02/10/22   Page 15 of 20   Document 1

device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

45. Based on my training and experience, I know that Verizon can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

46. Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

47. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can

15

be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

48. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

49. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Brian M. D'Arcy 02/10/22 at 12:28 PM
BRIAN M. D'ARCY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February 10, 2022.

HON. JAMES R. SICKEL
United States Magistrate Judge

16

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(715) 701-3844** ("the Account"), that are stored at premises controlled by Verizon ("the Provider"), headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that **has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on November 18, 2021 (Case Number 21517041)**, the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a. All subscriber information, including name, address, contact numbers, activation/deactivation dates, account number, social security number, and account features;

   b. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data transactions;

   c. All device identifiers, to include ESN, MEID, IMEI, and IMSI;

   d. All available RTT reports, to include 1X, EVDO, LTE, and data;

   e. IP Session and IP Source-Destination reports;

   f. All text message content, to include pictures OR provide the Cloud account which stores this content;

   g. Device identifiers, such as IMEI, for all devices (watches, HUM, tablets, etc.) that are connected/paired to this number/subscriber account.

The Provider is requested to disclose the above-listed information pertaining to the Account listed in Attachment A for the following dates and times:

- April 20, 2021: 12:01 AM to 11:59 PM
- April 21, 2021: 12:01 AM to 11:59 PM
- April 24: 2021: 12:01 AM to 11:59 PM
- April 25, 2021: 12:01 AM to 11:59 PM
- April 30, 2021: 12:01 AM to 11:59 PM
- May 6, 2021: 12:01 AM to 11:59 PM
- May 13, 2021: 12:01 AM to 11:59 PM
- May 16, 2021: 12:01 AM to 11:59 PM
- May 19, 2021: 12:01 AM to 11:59 PM
- May 24, 2021: 12:01 AM to 11:59 PM
- June 2, 2021: 12:01 AM to 11:59 PM
- June 3, 2021: 12:01 AM to 11:59 PM

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Section 841(a), involving Candice Sanapaw and Samantha Rojas during the period from April 20, 2021 to June 3, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.